UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**WELLS FARGO BANK, N.A.**,

                        Plaintiff,

      v.

**THE ASH ORGANIZATION, et al.**,

                      Defendants.

No. 09-CV-188-MO

OPINION AND ORDER

**MOSMAN, J.,**

       Plaintiff Wells Fargo Bank, N.A. sued defendant and third-party plaintiff Thunderbird Mobile Club, LLC to foreclose on the property that secures a six-million dollar loan to Thunderbird because Thunderbird has been unable to make its monthly loan payments since May 2008. Wells Fargo now moves for partial summary judgment on Thunderbird's three affirmative defenses and counterclaim, as well for summary judgment on Wells Fargo's own Third Claim for Relief, which seeks to foreclose on Thunderbird's property. (Pl.'s Mot. for Partial Summ. J. (#165).) Thunderbird's three affirmative defenses, which also form the basis for its counterclaim and third-party complaint, allege that: (1) circumstances made it impossible for Thunderbird to fulfill its obligations under the loan agreement, (2) Wells Fargo and Midland acted in bad faith, and (3) the prepayment charge described by the loan documents constitutes an unlawful penalty. Third-Party Defendant Midland Loan

Services, Inc. also moves for summary judgment on Thunderbird's Third-Party Complaint against Midland, which alleges that Midland tortiously interfered with the loan agreement between Thunderbird and Wells Fargo. (Third Party Def.'s Mot. for Summ. J. (#160).) For the reasons that follow, I GRANT IN PART AND DENY IN PART Wells Fargo's motion for summary judgment, and I GRANT Midland's motion for summary judgment.

## BACKGROUND

Thunderbird owns vacant land that was formerly used as a mobile home park. In April 2004, Thunderbird obtained a six-million dollar loan from Bridger Commercial Funding LLC ("the Bridger Loan"). The loan was executed through a promissory note and deed of trust encumbering Thunderbird's land (collectively, "the loan documents").[1] The Ash Organization, Inc., another business entity owned by Thunderbird president Roger Ash, guaranteed the loan.[2] (Donahue Decl. (#171) Ex. C.) Shortly after executing the loan, Bridger assigned the promissory note and deed of trust to Bank of America. (*Id.* Ex. D.)

Bank of America packaged the Thunderbird loan with other several other loans through a Pooling and Servicing Agreement ("PSA") that transferred the loans into a billion-dollar pool and sold pieces of the pool to numerous investors. The pooled loans were sold to Wells Fargo, in trust,

---

[1] Citations to Promissory Note § ___ refer to provisions of the Thunderbird Promissory Note Secured By Deed of Trust, which can be found at Exhibit A of the Kevin Donahue Declaration in support of Plaintiff's Motion for Partial Summary Judgment (#171). Citations to Deed of Trust § ___ refer to provisions of the Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture Filing), which can be found at Exhibit B of the Donahue Declaration (#171). The parties agree that these are the authentic loan documents signed by Roger Ash on behalf of Thunderbird. (Miner Decl. (#168) Ex. A at 2, 4.)

[2] The Ash Organization, Inc., the Roger Ash Revocable Living Trust, and Roger Ash in his individual capacity are referred to collectively as "the Ash defendants."

and the PSA named Wells Fargo as trustee. (PSA § 1.01.)[3] The PSA also named Bank of America, N.A. as "Master Servicer" and named Midland as "Special Servicer" and provided that the parties would service the loans on behalf of Wells Fargo. (PSA §§ 1.01, 3.01(a).) Under the PSA, the Master Servicer is responsible for servicing performing loans that are not in default; the Special Servicer is responsible for servicing loans that are in default. (*See* PSA § 3.01(b); Dickas Decl. (#178) Ex. F at 2-13.) However, Midland serviced the Thunderbird loan during all times relevant to these motions for summary judgment. (*See* Midland's CSMF (#162) ¶¶ 5-8, 17-18, 20-21, 25-28.) While the Thunderbird loan was not in default, Midland serviced the loan as a sub-servicer for the Master Servicer, Bank of America. (Wells Fargo's CSMF (#167) ¶ 8.) When Thunderbird defaulted on the loan in May 2008, the loan was "transferred" and serviced by Midland in its capacity as Special Servicer. (*See id.*)

In 2005, after executing the Bridger loan, Thunderbird listed its property for sale. (*Id.* at ¶ 9.) Concerned that a new owner would elect to close the mobile home park, several tenants moved out. (*Id.* at ¶ 11.) Other tenants petitioned the City Council of Wilsonville for protection from potential closure. (Roger Ash Decl. (#177) ¶ 4.) In response to the tenant complaints, the City of Wilsonville passed an ordinance that required mobile home park owners to take affirmative steps to relocate their tenants before they could close their parks. (*Id.*) Thunderbird estimated that the cost of complying with the Wilsonville Ordinance ("the Ordinance") would exceed $ 5 million. (*Id.* at ¶ 5.) Thunderbird became embroiled in a legal battle with the City of Wilsonville over the constitutionality of the Ordinance while it continued to lose tenants. (*Id.* at ¶ 6.) During the same time period, Thunderbird

---

[3]    Citations to PSA § ___ refer to provisions of the July 1, 2004, Pooling and Servicing Agreement between Wells Fargo, Midland and Bank of America, which are attached to the Declaration of William Dickas in Support of Motion to Prove Authority and Suggesting Lack of Jurisdiction (#22).

learned that its property would be substantially more marketable as a vacant lot, and that no buyers were willing to purchase the land while it operated as a mobile home park and while the Ordinance was in effect. (*Id.* at ¶¶ 7-8.) In May 2007, after the City of Wilsonville Ordinance was struck down as unconstitutional, Thunderbird decided to close the mobile home park, giving notice that all tenants would have to move out before the park was closed in March 2008. (*Id.* at ¶¶ 7-8.)

In the summer of 2007, Thunderbird found a developer who was willing to purchase the land. (*Id.* at ¶ 10.) The purchaser required eighteen months to close the deal, but was willing to pay Thunderbird $75,000 a month toward the purchase price until closing. (*Id.*) Thunderbird planned to use that money to keep the Bridger loan payments current. (*Id.*) In order to execute the agreement, the purchaser required the purchase agreement to be secured by a lien on Thunderbird's property. (*Id.*) Thunderbird approached Midland for consent to the secondary lien. (*Id.* at ¶¶ 12-13.) Midland refused its consent, and the purchaser pulled out of the deal. (*Id.* at 13.)

From a combination of lost tenant rent income and an inability to sell its land, Thunderbird was unable to make its monthly payments beginning in May 2008. (*See* Wells Fargo's CSMF (#167) ¶ 12; Miner Decl. (#168) Ex. B at 3.) In September 2008, Thunderbird found a party willing to finance a loan for $750,000 to keep the loan payments current for two years. (Roger Ash Decl. (#177) ¶ 15.) However, that party also required a secondary lien on the property. (*Id.*) When Thunderbird requested Midland's consent to the lien, Midland refused again, this time in its capacity as Special Servicer. (*Id.* at ¶¶ 16-20; *see also* Wells Fargo's CSMF (#167) ¶¶ 8.)

The Loan Agreement also provided that a certain portion of the loan ("impounds") should be held in reserve to be applied to repairs and capital improvements. (Promissory Note, Ex. A § 3.) In October 2007 and September 2008, Thunderbird asked Midland to apply approximately $543,000 worth of impounds toward outstanding loan payments. (Dickas Decl. (#178) Ex. C & Ex. I; Miner

Decl. (#163) Ex. B at ¶ 18; Roger Ash Decl. (#177) ¶ 12.) Each time, Midland refused. (Midland's CSMF (#162) ¶ 20; Miner Decl. (#163) Ex. B at ¶ 11; Roger Ash Decl. (#177) ¶¶ 12-13, 16-19.)

When Thunderbird was unable to sell its property or otherwise cure the default, Wells Fargo filed this action to recover the unpaid balance under the promissory note and to foreclose on Thunderbird's property. (Compl. (#1).) Thunderbird answered, asserting affirmative defenses, a counterclaim against Wells Fargo and a third-party complaint against Midland for tortious interference with contract. These claims are based primarily on the following theories: (1) that the City of Wilsonville Ordinance was a supervening event that made Thunderbird's performance of the contract impossible or impracticable; (2) that Midland unreasonably withheld its consent to the second liens and to releasing impounds; and (3) the prepayment charge assessed for prepayment after default is an unlawful penalty. (Am. Answer (#133).) I now consider Wells Fargo's and Midland's motions for summary judgment on these claims.

## DISCUSSION

### I. <u>Legal Standard</u>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). After a party moves for summary judgment and properly supports that motion with evidence, the burden of production shifts to the opposing party. Fed. R. Civ. P. 56(e)(2). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

#### A. *Thunderbird's Response to Motions for Summary Judgment*

Federal Rule of Civil Procedure ("Rule") 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

*See also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (holding that a "district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."). Local Rule 56-1(c) also requires that each party submit a Concise Statement of Material Facts in which "[f]acts must be stated in separately numbered paragraphs" and "[a] party must cite to a particular affidavit, deposition, or other document (indicating both page and line number references where appropriate) supporting the party's statement, acceptance, or denial of the material fact."

Thunderbird's opposition to fail to comply with Rule 56 and Local Rule 56-1(c) in several respects. Although the parties have filed several exhibits in support of their respective positions, Thunderbird's Response (#176) contains a total of three citations to affidavits in the record, and its Responses to Wells Fargo's and Midlands' Concise Statements of Material Fact contain no citations to exhibits whatsoever. (*See* (#174), (#175).) Nor has Thunderbird "articulate[d] other relevant material facts which are at issue or are otherwise necessary for the Court to determine the motion[s] for summary judgment." *See* LR 56-1(b)(2). Instead of citations to evidence, Thunderbird's responses rely almost exclusively on bare allegations and denials. Therefore, although Thunderbird denies many of the statements made in Wells Fargo's and Midland's properly supported Concise Statements of Material Fact, I have accepted Wells Fargo's and Midland's evidence as undisputed where Thunderbird has not identified specific contradictory facts.

II.    **Wells Fargo's Motion for Summary Judgment**

    A.    ***Thunderbird's Affirmative Defenses***

        1.    **Impossibility and Impracticality**

In its First Amended Answer, Thunderbird's First Affirmative Defense alleges "the intervening legislation of the City of Wilsonville, and subsequently of the Oregon Legislature, [made it] impossible and impracticable to continue the operation of Thunderbird as a mobile home park." (First Am. Answer (#133) ¶ 39.) Under Oregon law, a party may be excused from performance of a contract if a supervening event makes performance impossible. *Savage v. Peter Kiewit Sons' Co.*, 432 P.2d 519, 522 (Or. 1967). "Supervening impossibility occurs 'where . . . facts that a promisor had no reason to anticipate, and for the occurrence of which he is not in contributing fault, render performance of the contract impossible . . . .'" *Id.* (quoting Restatement (First) Contracts § 457 (1932)).  Similarly, a party may be excused from performance "[i]f the performance of a duty is made impracticable by having to comply with a domestic . . . regulation or order, [and] that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 264 (1981). However, "[u]nexpected difficulties and expense . . . whether caused by injunction or by other causes, do not . . . excuse performance of a contract" if the difficulties "reasonably should have been guarded against." *Savage*, 432 P.2d at 522.

        a)    **Impossibility**

The evidence fails to show a genuine issue of material fact as to whether the City of Wilsonville made Thunderbird's performance of the loan "a practical impossibility" under Oregon law. Thunderbird's expenses began to exceed its revenues in 2004, before the park was listed for sale, but the financial situation became worse every year after. (Miner Decl. (#163) Ex. D at 4.) It is

undisputed that Thunderbird listed the mobile home park for sale in 2005, before the City of Wilsonville Ordinance was passed, and that tenants began moving out of the park in significant numbers after they received notice of the listing. (Miner Decl. (#163) Ex. C at 7 (stating that tenants "were leaving quite rapidly" after they received notice that the park was for sale, and, although "a few of the tenants stayed after the ordinance was passed" there were not enough remaining tenants "to pay the expenses"); Miner Decl. (#163) Ex. D at 3 ("Once the property was listed for sale we saw a tremendous increase [in tenant vacancies].") Thunderbird was a single-purpose entity that financed its loan payments exclusively through tenant rent income. (Miner Decl. (#168) Ex. B at 3, 4.) In February 2007, after the Ordinance was struck down as unconstitutional, Thunderbird posted a one-year eviction notice requiring its tenants to vacate the park before March 2008. (Miner Decl. (#163) Ex. C at 7, 16-17.) Mr. Ash said he decided to close the park "[b]ecause there were not enough tenants in there at that time to pay the bills, and we wanted . . . to sell [the property] as . . . vacant land." (Miner Decl. (#163) Ex. C at 7, 16.) In May 2008, Thunderbird failed to make its monthly payment on the Bridger Loan for the first time. (Miner Decl. (#163) Ex. C at 9.)

Thunderbird argues that there is an issue of material fact regarding whether the parties to the contract could have reasonably foreseen the passage of the Ordinance or the problems the Ordinance would cause. I assume, for purposes of summary judgment, that it was unforeseeable that the City of Wilsonville would pass an unconstitutional ordinance that severely restricted Thunderbird's rights as a property owner. But resolving the foreseeability of the Ordinance does not end the analysis, as Thunderbird suggests. Instead, assuming that the Ordinance was unforseeable, the following critical questions remain: Is there sufficient evidence from which a reasonable fact-finder could conclude that the Ordinance (1) caused (2) a hardship so extreme as to render performance impossible (3) through no contributing fault of Thunderbird? Thunderbird's Response articulates no evidence on

these points, let alone evidence that would create a genuine issue of material fact. (*See* Resp. (#176) 6-7.) For example, Thunderbird has not identified any evidence that shows Thunderbird experienced a hardship so extreme as to render performance impossible, as opposed to experiencing "unexpected difficulty or expense" that would not excuse performance. *See Savage*, 432 P.2d at 522.

In contrast to Thunderbird's lack of evidence, Wells Fargo's undisputed evidence shows that passage of the Ordinance is only one of several factors that contributed to Thunderbird's inability to make its monthly rent payments on the Bridger loan, and that the other factors are direct results of actions taken and decisions made by Thunderbird. It is undisputed that loss of tenant income contributed to Thunderbird's inability to make its payments. (*See* Stan Ash Dep. (#163) Ex. G at 4 (stating that Thunderbird was unable to make its monthly loan payments because "[t]here was no money coming in" as a result of "[t]he park being empty").) It is likewise undisputed that many tenants left the mobile home park in response to Thunderbird's sale listing, before the Ordinance was passed. The evidence also shows that Thunderbird had difficulty selling its property not only because of the Ordinance, but also because buyers preferred to purchase the land as a vacant lot rather than as a mobile home park. (*See* Roger Ash Decl. (#177) ¶ 8 (noting that buyers were not interested in purchasing the property as an operating mobile home park, even after the ordinance was voided).) Although Thunderbird was entitled to sell its property, the financial difficulties caused by loss of tenant income and difficulty selling the property were not problems that Thunderbird had no reason to anticipate, nor were they problems for which Thunderbird lacked any contributing responsibility. The same is true with respect to Thunderbird's 2007 decision to close the park and evict all remaining tenants, which preceded its failure to make its monthly loan payment in May 2008.

Therefore, although a reasonable fact-finder could determine that an unforseeable city ordinance caused unexpected difficulty in selling the property and maintaining tenant rent income,

that same fact-finder would be unable to conclude that the Ordinance was a supervening event that created a hardship so extreme as to render performance impossible through no contributing responsibility of Thunderbird. Accordingly, Wells Fargo's motion for summary judgment is granted as to Thunderbird's impossibility defense.

**b)    Impracticality**

Thunderbird's impracticality defense is also based on the City of Wilsonville Ordinance and produces a similar analysis. With respect to impracticality, the critical question is whether Thunderbird can show that "the non-occurrence [of the Ordinance] was a basic assumption on which the contract [with Bridger] was made." *See* Restatement (Second) Contracts § 264; *see also* Restatement (Second) Contracts §§ 261, 266 (suggesting that performance may be excused, outside of the government regulation context, where impracticality is caused by an event or fact "the non-existence of which was a basic assumption on which the contract is made"). Thunderbird produced no evidence on this point, while Wells Fargo presented unrefuted evidence that shows Thunderbird's obligations under the loan documents did not depend on the non-occurrence of the Ordinance. Specifically, because the loan documents required Thunderbird to continue operating its property as a mobile home park, an ordinance that severely restricted Thunderbird's ability to close the park did not contravene the intention of the parties. (*See* Deed of Trust § 3.4 (prohibiting Thunderbird from taking any action that "materially alter[s] the type of occupancy or use of all or any part of the property"); Deed of Trust, Ex. B (requiring Thunderbird to "conduct and operate its business as presently and currently conducted").) Instead, the Ordinance actually made it more difficult for Thunderbird to act in a way that violated the covenants contained in the loan agreement. (*See* Roger Ash Decl. (#177) ¶ 4 (listing the burdensome requirements imposed by the Ordinance, all of which pertain to obtaining a permit to close a mobile home park).) For that reason, no reasonable fact-finder

could conclude that the non-existence of onerous restrictions on closing the mobile home park was a basic assumption of the parties to the loan agreement. Wells Fargo's motion for summary judgment is granted as to Thunderbird's impracticality defense.

### 2.    Unreasonably Withholding Consent

Thunderbird's Second Affirmative Defense alleges, inter alia, that Midland "wrongfully, arbitrarily and unreasonably refused" to consent to a second lien on the property and refused to apply impound funds to Thunderbird's outstanding payments on the loan. (First Am. Answer (#133) ¶¶ 24-27, 30-31, 41-44.) For purposes of Wells Fargo's Motion for Summary Judgment, the issues are whether the loan documents authorized Midland to unreasonably withhold its consent in these contexts, and, if not, whether Thunderbird has presented evidence from which a reasonable fact-finder could conclude that the consent was unreasonably withheld. For the reasons that follow, I conclude that the contract did not permit Midland to withhold its consent unreasonably, meaning arbitrarily, capriciously, or in bad faith, and that Thunderbird has shown a genuine issue of material fact with respect to this claim.

### a)    Consent to a Second Lien

There is no dispute that both the promissory note and deed of trust contain the same general provision:

> Wherever Lender's consent, approval, acceptance or satisfaction is required under any provision of this Note or any of the other Loan Documents, such consent, approval, acceptance or satisfaction shall not be unreasonably withheld, conditioned or delayed by Lender unless such provision expressly so provides.

(Promissory Note § 10.10; Deed of Trust § 8.3.) The parties further agree that a general reasonableness provision, such as the one above, may be overriden if a particular provision expressly provides. *See Carey v. Lincoln Loan Co.*, 998 P.2d 727, 732 (Or. Ct. App. 2000) (holding that "[t]he

duty of good faith applies to all contract provisions . . . [u]nless other terms in the contract indicate a contrary expectation"). The parties differ only in their interpretation of the provision that governs Wells Fargo's discretion in consenting to second liens, which states: "Without obtaining Beneficiary's prior written consent (which consent shall be granted or withheld in Beneficiary's sole and absolute discretion and at Trustor's sole cost and expense), Trustor shall not incur any debt . . . other than the [Bridger] Loan." (Deed of Trust § 6.7(a).)

Wells Fargo argues that the phrase, "consent shall be granted or withheld in Beneficiary's sole and absolute discretion," expressly provides that the lender may unreasonably withhold consent to a second lien. Thunderbird asserts that authority to exercise discretion is different from authority to act unreasonably; therefore, a lender must exercise its discretion reasonably unless a specific provision states: "the lender may unreasonably withhold consent." Although I decline to determine the exact language required to expressly override a general duty of reasonable consent, I am persuaded that a lender's authority to exercise "sole and absolute discretion" does not include the authority to exercise that discretion unreasonably.

The language the parties have selected to describe how consent will be granted or withheld under the loan documents has been interpreted by Oregon courts, and those courts have placed restrictions on the way in which a party can exercise "sole and absolute discretion." Under Oregon law, a party must exercise its discretion within the boundaries of Oregon's implied duty of good faith and fair dealing. *Best v. U.S. Nat'l Bank*, 739 P.2d 554, 558 (Or. 1987)). In addressing the relationship between discretion and the implied duty of good faith, Oregon courts hold:

> When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that the discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith.

-12-

*Id.*; *Tolbert v. First Nat'l Bank of Or.*, 823 P.2d 965, 969-70 (Or. 1991) (affirming that "good faith is required in the performance of the contract and the exercise of discretion under it" and that the "objectively reasonable expectations of [the] parties . . . will be examined in determining whether the obligation of good faith has been met"); *see also Pac. First Bank v. New Morgan Park Corp.*, 879 P.2d 761, 767-68 (Or. 1994) (holding that the landlord's exercise of discretion complied with the duty of good faith because, based on the language of the lease, that unrestricted discretion effectuated the reasonable expectations of the parties). These limitations on discretion remain even when a party has been given "sole and absolute" discretion under a contract. *Sustina Ltd. v. Pac. First Fed.*, 846 P.2d 438, 440 (Or. Ct. App. 1993)*.* This means, at a minimum, that the "sole and absolute discretion" granted to Wells Fargo by § 6.7 of the deed of trust does not include a right to act arbitrarily, capriciously, or in bad faith.

    As described above, "bad faith" is a term of art rather than a term defined by common usage. A party acts in bad faith by exercising its discretion "for purposes not contemplated" by the parties to the contract. *Best*, 739 P.2d at 558. A party would not act in bad faith by acting unilaterally, without the other party's advice or consent, because unilateral action is consistent with the definition of "sole and absolute discretion" and therefore consistent with the expectations of the parties. *See Black's Law Dictionary* 499 (8th ed. 2004). In the context of a loan agreement, a lender may act in its own interest, and contrary to the interest of the borrower, as long as the lender's response is consistent with the way the parties would expect the lender to respond when confronted with that specific set of facts. For example, if a borrower experienced indisputable problems with its income stream, it is within the reasonable expectations of the parties that the lender would move toward foreclosure. And it would not be relevant for the borrower to argue that it could have resuscitated its income stream and turned its business around if the lender had given it more time. The key

question would not be whether the borrower had a sound business proposal for generating future income, but whether there were certain facts about the status of the loan that grounded the lender's decision in the reasonable expectations of the parties. Therefore, the same lender would act in bad faith if the borrower's income stream was fine but the lender nevertheless withheld its consent to a second lien because of racial bias or because the borrower's property has dramatically increased in value and the lender wanted to acquire it.

In this case, there is a dispute of material fact regarding whether Wells Fargo, through Midland, exercised its discretion in a manner consistent with the reasonable expectations of the parties. For example, Thunderbird has presented evidence from which a reasonable fact-finder could conclude that Midland's decision to refuse second liens was motivated by a desire to acquire Thunderbird's property rather than by a need to preserve the income stream from the loan. (*See* Dickas Decl. (#178) ¶ 12 & Ex. G.) On the other hand, Wells Fargo has presented evidence from which a reasonable fact-finder could conclude that the decision was made for legitimate business reasons that were consistent with the parties' objectively reasonable contract expectations. (*See* Torgler Dep. (#163) Ex. F at 8-11; Bolen Dep. (#163) Ex. E at 9-11.) Accordingly, this issue is reserved for trial, and Wells Fargo's Motion for Partial Summary Judgment is denied as to Thunderbird's allegation that consent to a second lien was unreasonably withheld.

### b)    Consent to Release Impounds

The impounds of the Bridger loan are governed by § 3 of Exhibit A to the Promissory Note. These funds were deposited with the lender for the purpose of paying a specific set of enumerated costs, including taxes, insurance, repairs, and capital improvements. Promissory Note, Exhibit A § 3.1. Under the terms of the agreement, and if no default exists, "Lender shall release the Impounds to Borrower once a calender quarter to pay or reimburse Borrower" for repair work or capital

improvements upon the fulfillment of certain procedural requirements. *Id.* § 3.2(d), (e). If a default

event occurs, "[n]o application of any Impound funds shall be deemed to cure [the] Default." *Id.* §

3.3(d). However, the "Lender may in its sole and absolute discretion, but shall not be obligated to,

apply at any time the balance then remaining in the Impounds against the principal and interest." *Id.*

For the reasons discussed with respect to the secondary lien, § 3.3(d) did not grant Wells

Fargo or Midland the authority to exercise their discretion arbitrarily, capriciously, or in bad faith,

and there are issues of material fact as to whether Midland's discretion was exercised in a manner

consistent with the contractual expectations of the parties. (*See* Dickas Decl. (#178) ¶ 13; Ex. G; Ex.

D at 2-3, 5-6; *see also* Bolen Decl. (#163) Ex. B ¶ 18 (indicating that impounds were applied against

the principal and interest after foreclosure proceedings had commenced).) Therefore, Wells Fargo's

motion is denied with respect to the claim that Midland unreasonably withheld its consent to apply

impounds against the loan's principal and interest.

### 3.    Unlawful Penalty

In its Third Affirmative Defense, Thunderbird asserts that "[t]he prepayment charge

demanded by Plaintiff constitutes an unlawful, unreasonable and unenforceable liquidated damage

clause, and an unlawful, unenforceable penalty." (First Am. Answer (#133) ¶ 46.) This allegation

presumably refers to § 13 of the promissory note, which forbids voluntary prepayment, except when

made within three months of the loan's maturity date, and requires a prepayment charge if

involuntary prepayment occurs after the borrower defaults and a lender accelerates the principal.

Oregon courts use a two-part inquiry to determine whether a contract provision is an unlawful

liquidated damages clause. *Kesterson v. Juhl*, 970 P.2d 681, 683 (Or. Ct. App. 1998). First, the court

"determine[s] whether the disputed clause actually is a liquidated damages clause." *Id.* Second, if

the clause provides for liquidated damages, then court determines whether those damages are

-15-

imposed as an unlawful penalty. *Id.* The opponent of the purported liquidated damages clause bears the burden of proving that the clause unlawful. *Illingworth v. Bushong*, 688 P.2d 379, 388 (Or. 1984), *overruled on other grounds by DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 785 P.2d 343 (Or. 1990).

With respect to the first part of the test, Oregon defines a liquidated damages clause as "words of a contract that set the amount of damages to be recovered by one party from another in case of the latter's failure to perform as agreed." *Kesterson*, 970 P.2d at 683 (quoting *DiTommaso*, 785 P.2d at 345). Applying this definition, I find the prepayment charge is a liquidated damages clause. In making this determination, I am careful "to distinguish between two independent theories of recovery—(1) that an amount is due because a contract term has been satisfied, and (2) that liquidated damages are due because a breach has occurred." *Ditommaso*, 785 P.2d at 346. Here, the prepayment charge is assessed only after a borrower defaults (Promissory Note § 13.2(a).) Perhaps more importantly, the prepayment charge is an imprecise estimate of the lender's lost interest rate yield that accounts for the possibility that the lender will be required to "reinvest any such prepayment amount in loans of a lesser interest rate yield." (Promissory Note § 13.) In other words, the prepayment charge is not an exact calculation of the borrower's full debt to the lender (principal plus interest) over the life of the loan, but rather the anticipated loss-of-interest damages from the borrower's failure to perform as agreed.

But because the prepayment charge seeks to estimate anticipated loss-of-interest damages, it is not an unlawful penalty under the second prong of analysis. A party may be entitled to liquidated damages in the event of a breach if the damages are in "an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." *Illingworth*, 688 P.2d

at 390 (quoting Or. Rev. Stat. § 72.7180(1)). Here, the plain language of the promissory note demonstrates that the prepayment charge, although a significant sum of money, is directly related to loss-of-interest damages from having to reinvest the loan principal at a lower interest rate than the fixed interest rate of the original loan. (*See* Promissory Note §§ 13, 13.2(a)(ii).) As the party opposing the prepayment charge, it is Thunderbird's burden to prove that the charge is unreasonably large in relation to Wells Fargo's damages from lost interest, and it has presented no evidence in that respect. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Accordingly, Wells Fargo is entitled to summary judgment on Thunderbird's Third Affirmative Defense.

### B.  *Wells Fargo's Third Claim for Relief*

Because Wells Fargo's motion for summary judgment is denied as to Thunderbird's Second Affirmative Defense, Thunderbird has a right to prove at trial that Wells Fargo breached the loan documents and is not entitled to foreclose on the property. *See Mitchell v. Pac. First Bank*, 880 P.2d 490, 496 (Or. Ct. App. 1994) ("[T]he general rule of law is that a party who complains that the other party is in breach of contract must themselves prove performance of the contract on their part up to that point."). Therefore, Wells Fargo's motion for summary judgment is denied as to Wells Fargo's Third Claim for Relief.

### III.  <u>Midland's Motion for Summary Judgment</u>

Thunderbird's Third-Party Complaint alleges "Breach of Loan Agreement Against Bank of America, N.A. and Anthracite Capital, Inc.; Wrongful Interference with Loan Agreement Against

Midland Loan Services, Inc." (First Am. Answer (#133) 20.) In its motion, Midland expressed

confusion as to whether it is defending against a breach of contract claim or a tortious interference

claim, as the third-party complaint states that the claim is one for wrongful interference but also

contains language that suggests the claim is one for breach of contract. (*See* Mem. in Supp. of Mot.

(#161) 11-12.)

In defending against Thunderbird's claim, Midland is entitled to take the language of the

third-party complaint at face value. That is, Midland is entitled to assume from the plain language

of Thunderbird's pleading that Thunderbird asserts only a claim for tortious interference against

Midland, as opposed to a claim for breach of contract. (*See also* Def.'s Resp. to Wells Fargo's CSMF

(#174) ¶¶ 5, 7 (denying that Midland acted as an agent of Wells Fargo in servicing the loan).)

In moving for summary judgment, Midland asserts that it acted as an agent of Wells Fargo

while servicing the Thunderbird loan and therefore could not have tortiously interfered with the

Thunderbird loan agreement. Thunderbird did not respond to Midland's evidence that it is an agent

of Wells Fargo. Instead, Thunderbird asserted only that '[t]his Court has already ruled that . . . an

alleged 'agency' relationship between Midland and Wells Fargo is a question of evidence, not of legal

conclusion." (Defs.' Resp. (#) 7.) This argument misinterprets the Court's Opinion & Order of

December 8, 2009 (#117). In that opinion, which considered the parties' arguments only in the

context of a Rule 12(b)(6) motion to dismiss, "I reject[ed] Midland's argument that it [was] clearly

an agent of Wells Fargo on the face of the . . . complaint" and ruled that "[t]he nature of the

relationship between Midland and Wells Fargo will likely require evidence of conduct unavailable

on the current record." (Op. & Order (#117) 7.) In so holding, I found it material that the PSA, which

created and governs the relationship between Midland and Wells Fargo, states, "[T]he relationship

of each of the Master Servicer and the Special Servicer to the Trustee . . . under this Agreement is

intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent." (PSA § 3.01(d).) This provision of the PSA was material because it tended to show that the parties did not intend to create an agency relationship, *see Eads v. Borman*, 227 P.3d 826, 829 (Or. Ct. App. 2010) ("[F]or an agency relationship to exist, both parties must also agree that the agent will act on the principal's behalf."), and Rule 12(d) prohibited the Court from considering evidence beyond the PSA and Thunderbird's complaint when ruling on Midland's motion to dismiss (*see* Op. & Order (#117) 4-5 (explaining the standard of review)).

Now, at the summary judgment stage, Midland has appropriately supplemented the record with evidence of conduct that the Court could not consider in the context of a motion to dismiss. I now consider whether Thunderbird has shown a genuine issue of material fact with respect to its tortious interference claim.

### A.    *Midland's Status as Special Servicer*

Pursuant to the terms of the PSA, Wells Fargo executed a limited power of attorney in favor of Midland. (Miner Decl. (#163) Ex. A.) The limited power of attorney appoints Midland as Wells Fargo's "true and lawful agent and attorney in fact with respect to the Mortgage Loans and each mortgaged property and related collateral being specially serviced." (*Id.*) Thunderbird has not met its burden to respond to this evidence by setting out specific facts showing a genuine issue for trial on the question of Midland's agency status while it acted as special servicer. *See* Fed. R. Civ. P. 56(e)(2). Accordingly, Midland is entitled to summary judgment as to its agency relationship with Wells Fargo as of May 2008, the date Thunderbird first defaulted on its loan payments and the Thunderbird loan entered special servicing. Because Midland was acting as Wells Fargo's agent, it was legally a party to the loan agreement. Because an entity cannot, as a matter of law, tortiously interfere with a contract to which it is a party, *Boers v. Payline Sys. Inc.*, 918 P.2d 432, 435 (Or. Ct.

App. 1996), I grant Midland's motion for summary judgment on Thunderbird's tortious interference claim as to all allegations arising after May 2008.

**B.**    ***Midland's Status as a Sub-Servicer for Bank of America***

Prior to May 2008, however, Midland acted as a sub-servicer for Bank of America, rather than as a Special Servicer for Wells Fargo. Therefore, Wells Fargo's limited power of attorney, which applies only when Midland acts as Special Servicer, is insufficient to establish an agency relationship during the period in which Midland acted as a sub-servicer for Bank of America. In support of an agency relationship, Midland points only to its Sub-Servicing Agreement with Bank of America, which indicates that Midland shall perform obligations on behalf of the Master Servicer. (Miner Decl. (#184) Ex. A). Even assuming, without deciding, that the Sub-Servicing Agreement establishes an agency relationship between Bank of America and Midland, nothing in the Sub-Servicing Agreement alters the PSA's provision describing the relationship of the Master Servicer (and its sub-servicer) to Wells Fargo as that of an independent contractor, not an agent.

Nevertheless, as Midland argues in support of its motion for summary judgment, resolution of a tortious interference claim under Oregon law does not necessarily depend on whether the allegedly interfering party is, or is not, an agent of one of the parties to the contract. Instead, the real question is whether Thunderbird has presented evidence from which a reasonable fact-finder could determine that Midland was acting as a "third party" to the loan agreement, which is an element that Thunderbird must prove to prevail on its tortious interference claim. *See Kaelon v. USF Reddaway, Inc.*, 42 P.3d 344, 347 (Or. Ct. App. 2002). By requiring a plaintiff to prove that the defendant is a third party to the contract, the tort "serves as a means of protecting contracting parties against interference in their contracts from *outside* parties." *McGanty v. Staudenraus*, 901 P.2d 841, 845 (Or. 1995) (emphasis in original); *see also Wieber v. FedEx Ground Package Sys., Inc.*, 220 P.3d 68, 77

(Or. Ct. App. 2009) (observing that the tort "protects the interests of a plaintiff from 'intermeddling strangers'") (quoting *McGanty*, 901 P.2d at 845).

Regardless of whether Midland was acting as an agent or independent contractor for Wells Fargo, there is no evidence from which a fact-finder could conclude that Midland was an intermeddling third-party stranger to Wells Fargo's contract with Thunderbird. *See Wieber*, 220 P.3d at 77 (holding that an independent contractor's tortious interference claim against a delivery company could not stand where the evidence showed that independant contractor's relationship with its customers was "inextricably linked" to its contractual relationship with the delivery company). Wells Fargo, Bank of America, and Midland created a contractual relationship through which Midland services and administers loans "on behalf of" Wells Fargo. (PSA § 3.01(a).) Under the PSA and the Sub-Servicing Agreement, Wells Fargo granted Midland the authority "to do or cause to be done any and all things in connection with such servicing and administration [of loans] which it may deem necessary or desirable." (PSA § 3.01(b).) The evidence indisputably shows that Wells Fargo interacted with Thunderbird only through Midland, and in this respect Wells Fargo's contractual relationship with Thunderbird was inextricably linked to its contractual relationship with Midland. Thunderbird has presented no evidence that Midland acted without intent to benefit Wells Fargo. *See Welch v. Bancorp Mgmt. Advisors, Inc.*, 675 P.2d 172, 178-79 (Or. 1983) (noting that an agent may be liable for tortious interference if he "acts against the best interests of the principal or acts solely for his own benefit" but is not liable if he "acts with 'mixed motives' to benefit himself or another principal as well"); *accord* Restatement (Second) Torts § 770 cmt. e (1979). Nor has Thunderbird responded to Midland's argument that an entity may be privileged to interfere with a contract even if it is not acting as an agent of the contracting party. For these reasons, Midland's Motion for Summary Judgment on the tortious interference claim is granted with respect to Midland's conduct

-21-

prior to May 2008. As Thunderbird's demand for a jury trial pertains only to its tortious interference

claim (First Am. Answer (#133) 1, 23), Midland's request to strike that demand is denied as moot.

## CONCLUSION

For the foregoing reasons, I GRANT IN PART AND DENY IN PART Wells Fargo's

Motion for Partial Summary Judgment (#165). The motion is granted as to Thunderbirds First

and Third Affirmative Defenses, and denied as to Thunderbird's Second Affirmative Defense and

Wells Fargo's Third Claim for Relief. I also GRANT Midland's Motion for Summary Judgment

(#160).

IT IS SO ORDERED.

DATED this __1st__ day of July, 2010.


/s/ Michael W. Mosman____
MICHAEL W. MOSMAN
United States District Court